JWB

**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Edward Hernandez | ) | No. CV 05-2853-PHX-DGC (JJM) |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| Dora Schriro, et al., | ) | |
| Defendants. | ) | |

Before the Court is Defendants' Motion for Summary Judgment (Doc. # 91), Plaintiff's Cross-Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment (Doc. # 114), Defendants' Response to Plaintiff's Cross-Motion for Summary Judgment and Reply in Support of Defendants' Motion for Summary Judgment (Doc. # 110), and Plaintiff's Reply in Support of his Cross-Motion for Summary Judgment (Doc. # 120). The Court will grant Defendants' summary judgment motion, deny Plaintiff's motion, and dismiss this action with prejudice.

**I.    Background and Procedural History.**

Plaintiff Edward Hernandez, a state prisoner, filed this *pro se* civil rights action on September 19, 2005 regarding conditions in Special Management Unit II ("SMU II"), the highest custody level in the Arizona Department of Corrections (ADC) (Doc. # 1). Plaintiff's Complaint asserted the following claims against Defendants ADC Director Dora Schriro, SMU II Deputy Warden Carson McWilliams, and ADC Correctional Classification Specialist Dorinda Cordova. Plaintiff seeks only declaratory and injunctive relief.

Count I:        Plaintiff's substantive and procedural due process rights have been violated by his continued and indefinite detention in SMU II isolation, which has resulted in the denial of a liberty interest, namely the interest in being free from continued indefinite solitary confinement.[1]

Count II:    Plaintiff's Eighth Amendment right to the minimal civilized measure of life's necessities and the right to be free from cruel and unusual punishment has been violated by: (a) indefinite solitary confinement; (b) the denial of outdoor recreation, direct sunlight, fresh air and adequate clothing; (c) constant cell illumination; (d) reduced diet causing a sedentary lifestyle; and (e) restricted social and environmental stimulation.

Count III:   Plaintiff's Eighth Amendment right to be free of excessive force has been violated by the use of force in a malicious and sadistic manner, without showing any disciplinary violation, but solely in retaliation for Plaintiff's exercise of his right to remain silent and an attempt to coerce him to waive that right.

Count IV: Plaintiff's right to practice his religion has been substantially burdened by Defendants in violation of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA).  Specifically, Plaintiff claims he has been unable to practice his Native American traditions because of his indefinite confinement in SMU II.

Defendants moved to dismiss Counts I and III of Plaintiff's Complaint on January 3, 2006 (Doc. # 16).  Defendants' motion was initially granted on May 19, 2006 (Doc. # 36).

_____

[1] Plaintiff alleges the following specific atypical conditions: (a) denial of outdoor recreation, exercise equipment, direct sunlight, and fresh air; (b) constant illumination of his cell; (c) lack of socialization or communication with other inmates; (d) denial of environmental and social stimulation (e.g. visitation, phone visits, etc.); (e) denial of access to prison programs (e.g. work, vocational, educational, recreational, etc.); (f) provision of a reduced calorie "lockdown" diet; (g) denial of active or semi-active lifestyle; (h) visitation limited in time and to non-contact visitation; (i) limited to 3 showers per week; (j) denial of access to the inmate store for food, cold weather clothing, etc.; (k) limited access to newspapers, music, etc.; (l) being subjected to "defecation watch"; (m) being subjected to the overuse of shackles and security devices if sent to an outside court appearance; and (n) being denied participation in sacred religious ceremonies.

1   On reconsideration, however, Counts I and III were reinstated on October 18, 2006 (Doc. #
2   58).

3        Defendants have now moved for summary judgment on Counts II and IV of Plaintiff's
4   Complaint (Doc. # 91). Plaintiff responded to Defendants' summary judgment motion and
5   cross moved for summary judgment on October 4, 2007 (Doc. # 114). Defendants responded
6   to Plaintiff's cross-motion, sought summary judgment on Counts I and III of Plaintiff's
7   Complaint, and replied in support of their motion (Doc. # 110). Plaintiff replied with
8   evidence in support of his motion and responded to Defendants' arguments (Doc. # 120).

9   **II.    Underlying Facts.**

10        It is undisputed that Plaintiff was validated as a member of a Security Threat Group
11   (STG) known as the Warrior Society[2] and, as a result, on December 19, 2003, he was placed
12   in a maximum custody arrangement known as SMU II. In SMU II, the inmates are severely
13   restricted in movement, and they lack privileges granted to inmates at lower custody levels.
14   Plaintiff filed the instant § 1983 action.

15        Following discovery, Defendants moved for summary judgment contending that
16   Plaintiff has not been subjected to cruel and unusual punishment in SMU II and that
17   Plaintiff's religious exercise has not been substantially burdened (Doc. # 91). Plaintiff
18   responded and cross-moved for summary judgment, contending that because he has been
19   denied "meaningful review[s]" of his continued detention in SMU II, he has established a
20   violation of his due process rights. Specifically, Plaintiff acknowledges that while he is not
21   challenging the initial validation process, he does contest the lack of adequate process in the
22   Defendants' review decisions (Doc. # 114 at 5). Plaintiff further alleges that the conditions
23   of confinement in SMU II violate the Eighth Amendment and he has been retaliated against
24   by the requirement that, to be transferred from SMU II, he must incriminate himself in a
25   debriefing process. In support of his motion, Plaintiff submitted copies of several reviews
26   of his STG status, the ADC's policies regarding STG inmates, copies of depositions

27

28        [2] Warrior Society was designated as a Security Threat Group effective July 5, 2001
(Dunn Decl. ¶ 5, Ex. 4. Doc. # 92)..

1   describing the living conditions in SMU II, and copies of grievances regarding the living

2   conditions in SMU II.

3       Defendants replied and moved for summary judgment on Counts I and III of

4   Plaintiff's Complaint, contending that (1) Plaintiff was given more than adequate due process

5   in the periodic reviews of his placement; (2) there is no evidence to show that the conditions

6   violated the Eighth Amendment nor that Defendants were deliberately indifferent to

7   Plaintiff's health or safety; (3) there is no evidence that Plaintiff's placement was retaliatory;

8   and (4) Plaintiff's religious exercise has not been substantially burdened, and even if it had,

9   Defendants' actions furthered a compelling government interest (Doc. ## 110, 111).

10  **III.    Summary Judgment Standard.**

11      A court must grant summary judgment if the pleadings and supporting documents,

12  viewed in the light most favorable to the non-moving party, "show that there is no genuine

13  issue as to any material fact and that the moving party is entitled to judgment as a matter of

14  law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

15  When considering a summary judgment motion, the evidence of the non-movant is "to be

16  believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty

17  Lobby, Inc., 477 U.S. 242, 248 (1986). These inferences are limited, however, "to those

18  upon which a reasonable jury might return a verdict." Triton Energy Corp. v. Square D. Co.,

19  68 F.3d 1216, 1220 (9th Cir. 1995).

20      Rule 56(c) mandates the entry of summary judgment against a party who, after

21  adequate time for discovery, fails to make a showing sufficient to establish the existence of

22  an element essential to that party's case, and on which the party will bear the burden of proof

23  at trial. Celotex, 477 U.S. at 322-23. Rule 56(e) compels the nonmoving party to "set forth

24  specific facts showing that there is a genuine issue for trial" and not to "rest upon the mere

25  allegations or denials of [the party's] pleading." The nonmoving party must do more than

26  "simply show that there is some metaphysical doubt as to the material facts." Matsushita

27  Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). There is no issue

28  for trial unless there is sufficient evidence favoring the non-moving party. Anderson, 477

1   U.S. at 249.  Summary judgment is warranted if the evidence is "merely colorable" or "not

2   significantly probative."  Id. at 249-50.

3   **IV.    Count I.**

4       Count I of Plaintiff's Complaint alleges violations of both his procedural and

5   substantive due process rights.

6       **A.    Procedural Due Process.**

7       Defendants argue that Plaintiff cannot make out a due process claim because he has

8   received all the process he is due under the STG review procedures (Doc. # 110 at 2-3).

9       The Due Process Clause of the Fourteenth Amendment prohibits the states from

10  "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S.

11  CONST. amend. XIV, § 1.  To determine whether a procedural due process violation has

12  occurred, a court engages in a two-step analysis.  First, a court looks to whether the person

13  possesses a constitutionally cognizable liberty interest with which the state has interfered.

14  Sandin v. Conner, 515 U.S. 472 (1995).  Second, if the state has interfered with a liberty

15  interest, a court looks to whether this interference was accompanied by sufficient procedural

16  and evidentiary safeguards.  See Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989);

17  see also Zimmerlee v. Keeney, 831 F.2d 183, 186 (9th Cir. 1987).

18      The parties do not dispute that Plaintiff's initial placement in SMU II implicates a

19  liberty interest requiring due process protections, nor could they after Wilkinson v. Austin,

20  125 S. Ct. 2384 (2005), in which the Supreme Court found that inmates in Ohio's prison

21  system had a liberty interest in remaining free from maximum security segregation units.  An

22  inmate may be deprived of his liberty interest as long as he is accorded the proper procedural

23  protections.  For the initial decision to place an inmate in maximum custody, due process is

24  generally satisfied by notice of the factual basis for the placement and an opportunity to be

25  heard.  Wilkinson, 125 S. Ct. at 2395-97; Hewitt v. Helms, 459 U.S. 460, 476 (1983).

26      In the ADC, certain groups are designated as a STG to help minimize the threat that

27  gang activity poses to the safe and secure operation of the prison (Dunn Decl. ¶ 3, Ex. 4.

28  Doc. # 92).  A STG is defined under ADC policy as:

Any organization, club, association or group of individuals, either formal or informal (including traditional prison gangs), that may have a common name or identifying sign or symbol, and whose members engage in activities that include, but are not limited to: planning, organizing, threatening, financing, soliciting, committing or attempting to commit unlawful acts or acts that would violate the Department's written instructions, which detract from the safe and orderly operation of prisons.

(Id. ¶ 4).  Validated STG members are housed in SMU II (Id. ¶ 12).

The Warrior Society was designated as an STG effective on July 5, 2001 (Id. ¶ 5). Plaintiff was validated as a member of the Warrior Society on December 7, 2001  (Id. ¶ 19). The validation process included notice and a hearing, and an evaluation of certain criteria (Id. ¶¶ 6-10).  The information relied upon to validate Plaintiff included the fact that Plaintiff admitted he was a member of Warrior Society during a documented interview dated September 29, 1998, and the fact that Plaintiff bears gang-specific tattoos on his neck, chest, and left forearm (Id. ¶ 19; STG Validation Packet at 2, 25-26, Ex. 4, Attach. C, Doc. # 92). Plaintiff has not alleged that he was not given notice and an opportunity to be heard at his initial validation hearing.  He also had an opportunity to appeal, which was denied (Doc. # 115, Ex. 15).  On May 18, 2004, Plaintiff was transferred to SMU II.

Plaintiff does not contest the validation of his membership in the Warrior Society (Doc. # 111 ¶ 13, Ex. 1 at 8).  Thus, whether his due process rights were violated by his initial placement in SMU II is not at issue.  His proper validation as an STG member bears on how much process he was due for his retention in SMU II.

## 1.    Retention in SMU II.

The parties dispute whether the review of Plaintiff's continued retention in SMU II violated due process.  Plaintiff avers he has been denied adequate process in the Defendants' review decisions that take place annually and keep Plaintiff in SMU II (Doc. # 114 at 15). Specifically, Plaintiff states that the sole issue is that Plaintiff is denied a "meaningful review" of his status when no actual misconduct is alleged to indefinitely confine him to SMU II (Id.).  Defendants responded that Plaintiff has been given reviews of his status annually, and that absent security concerns, Plaintiff is able to be present, make a statement, and present information to the Institutional Classification Committee (Doc. # 110 at 3).

1    The requirements of due process are flexible and variable depending on the particular

2    situation being examined.  Greenholtz v. Inmates of the Nebraska Penal and Correctional

3    Complex, 442 U.S. 1, 12 (1979).  Traditionally, the amount of process due is determined by

4    the framework established in Matthews v. Eldridge, 424 U.S. 319 (1976).  This requires

5    considering (1) the private interest that will be affected by the official action, (2) the risk of

6    an erroneous deprivation of such interest though the procedures used, and the probative

7    value, if any, of additional or substitute procedural safeguards, and (3) the government's

8    interest, including the function involved and the fiscal and administrative burdens that the

9    additional or substitute procedural requirement would entail.  Matthews, 424 U.S. at 335.  In

10   the prison context, the private interest of avoiding placement in SMU II "while more than

11   minimal, must be evaluated, nonetheless, within the context of the prison system and its

12   attendant curtailment of liberties."  Wilkinson, 125 S. Ct. at 2395.

13   There is no precedent which sets forth the precise standard for the process that must

14   be accorded an inmate in Plaintiff's circumstances.  The starting place for this analysis,

15   however, is dicta in Hewitt v. Helms, 459 U.S. 460 (1983).  The Hewitt Court addressed the

16   degree of process due for an inmate who was placed in segregation following a riot and

17   pending an investigation of his role in the riot.  The Court stated that due process required

18   only an informal, nonadversary review of the information supporting the decision to place

19   him in segregation.  Id. at 472.  In a footnote, the Supreme Court addressed the type of

20   review required to retain an inmate in segregation.  Administrative segregation "may not be

21   used as a pretext for indefinite confinement," which means that prison officials must engage

22   "in some sort of periodic review of the confinement of such inmates."  Id. at 477 n.9.

23        This review will not necessarily require that prison officials permit the
         submission of any additional evidence or statements.  The decision whether a
24       prisoner remains a security risk will be based on facts relating to a particular
         prisoner – which will have been ascertained when determining to confine the
25       inmate to administrative segregation – and on the officials' general knowledge
         of prison conditions and tensions, which are singularly unsuited for "proof" in
26       any highly structured manner.

27   Id.  Prison officials are entitled to rely on their "purely subjective evaluations and predictions

28   of future behavior," as well as their evaluations of risk to the institution.  See id. at 474.

1    Prison officials view Plaintiff as an ongoing threat to security because he was
2    validated as a member of the Warrior Society STG (Dunn Decl. ¶ 23).  He will not be
3    transferred from SMU II unless he renounces membership in the Warrior Society,
4    successfully debriefs, or successfully completes the STG Step-Down Program (Dunn Decl.
5    ¶ 13).  Plaintiff's contention that he should be transferred because he has not committed any
6    misconduct while in prison misses the reason for his confinement.  Plaintiff is confined
7    because of his STG membership, not his disciplinary history.  Thus, his placement in SMU
8    II is not a "pretext for indefinite confinement."  <u>Hewitt</u>, 459 U.S. at 477 n. 9.  As long as
9    Plaintiff has an opportunity to debrief or participate in the step-down program and be
10   transferred, the risk of error in the retention process is minimal.  Plaintiff acknowledges that
11   he can debrief to escape the "indefinite confin[ement]" of SMU II isolation (Doc. # 114 at
12   5).  But Plaintiff protests that he refuses to incriminate himself and place a "snitch" label on
13   himself (<u>Id.</u>).  Plaintiff has affirmatively avowed, however, that he is not challenging the
14   validation process (Doc. # 111 ¶ 13, Ex. 1 at 8).  His claim that he cannot renounce and
15   debrief is an improper backdoor attack on the validation process.

16   In addition to the open opportunity for debriefing and participation in the step-down
17   program, there are periodic retention reviews of Plaintiff's classification in SMU II.  As
18   indicated in <u>Hewitt</u>, 459 U.S. at 472, 477 n.9, these reviews may be informal and
19   nonadversary, and prison officials are not required to accept additional evidence or
20   statements.

21   Defendants claim the reviews occurred approximately every 180 days until February
22   13, 2006 when Plaintiff began receiving annual reviews (Crabtree Decl. ¶ 12).  The time
23   between reviews is only one factor to be considered in determining whether due process has
24   been satisfied.  Because there is no dispute that Plaintiff was properly validated as an STG
25   member and because he has an opportunity to debrief at any time, the time that has elapsed
26   between his retention reviews need not be brief.  Annual reviews suffice.

27   In addition, Defendants have presented evidence that when the classification reviews
28   occurred, Plaintiff had notice and an opportunity to submit information (<u>Id.</u> ¶ 13). Plaintiff

1    has not submitted any evidence to the contrary.  Indeed, he has submitted evidence that he

2    was given notice of subsequent classification reviews and had the opportunity to present

3    information to the committee (Doc. # 115, Ex. 7).  These protections go beyond what was

4    required in <u>Hewitt</u>, 459 U.S. at 477 n.9.  Although Plaintiff believes these reviews were

5    pretextual because he would not be transferred without renouncing his gang membership,

6    there is no evidence to show any pretext on the part of the Defendants, who were entitled to

7    rely on his validation as an STG member.  Because there is no evidence to show that

8    Plaintiff's retention reviews contravened due process, Defendants are entitled to summary

9    judgment on this claim.[3]

10          **B.     Substantive Due Process.**

11          In addition to asserting procedural due process rights, Plaintiff's Complaint alleges

12   that  he has been denied his substantive due process rights by his confinement in SMU II

13   (Doc. # 1 at 4).  "To establish a violation of substantive due process in this context, a plaintiff

14   ordinarily must prove that a challenged government action was 'clearly arbitrary and

15   unreasonable, having no substantial relation to the public health, safety, morals, or general

16   welfare'.   However, '[w]here a particular amendment 'provides an explicit textual source

17   of constitutional protection' against a particular sort of government behavior, 'that

18   Amendment, not the more generalized notion of "substantive due process," must be the guide

19   for analyzing [a plaintiff's] claims'.'" <u>Patel v. Penman</u>, 103 F.3d 868, 874 (9th Cir. 1996).

20          Plaintiff does not support his allegation with any argument in his briefs.  To the extent

21   he intended to challenge the procedures resulting in his placement in SMU II, those claims

22   are addressed above.

23          After conviction, the Eighth Amendment "serves as the primary source of substantive

24

25          [3] Plaintiff has another opportunity to be transferred out of SMU II.  The Court takes
26   judicial notice of Arizona Department of Corrections Department Order Manual 806.09
     detailing the prison's "STG Step-Down Program" wherein STG inmates may be transferred
27   to an "appropriate close custody housing unit in general population" after a period of 180
28   days.  Arizona Department of Corrections, Department Order Manual 806.09, (Doc. # 92,
     Ex. 4A).

1    protection . . . in cases . . . where the deliberate use of force is challenged as excessive and

2    unjustified." Whitley v. Albers, 475 U.S. 312, 327 (1986). "Any protection that 'substantive

3    due process' affords convicted prisoners against excessive force is, we have held, at best

4    redundant of that provided by the Eighth Amendment." Graham v. Connor, 490 U.S. 386,

5    395 (1989). Thus, to the extent that Plaintiff intended to challenge the conditions themselves,

6    they are addressed in connection with Plaintiff's cruel and unusual punishment claims.

7          Because any freestanding substantive due process claim is unsupported by Plaintiff,

8    Defendants will be granted summary judgment on such claim.

9    **V.    Count II.**

10   Count II of Plaintiff's Complaint alleges that the conditions of confinement in SMU

11   II violate the Eighth Amendment.  Plaintiff specifically challenges (a) his indefinite solitary

12   confinement; (b) the denial of outdoor recreation, direct sunlight, fresh air and adequate

13   clothing; (c) constant cell illumination; (d) reduced diet causing a sedentary lifestyle; and (e)

14   restricted social and environmental stimulation. The Court will address each allegation in

15   turn.[4]

16          **A.    Isolation and Restricted Social and Environmental Stimulation.**

17   Plaintiff alleges that he has served 4 years in isolation and faces at least another 3

18   years.  Courts must identify the specific conditions that violate the Eighth Amendment and

19   cannot rely on a vague conclusion of the "totality of conditions." Hoptowit, 682 F.2d at

20   1247. The Ninth Circuit has found that "administrative segregation, even in a single cell for

21   twenty-three hours a day, is within the terms of confinement ordinarily contemplated by a

22   sentence." Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995) (citing

23   Toussaint, 801 F.2d at 1091-92).  Even so, the Ninth Circuit has also recognized that the

24   harsh conditions such as SMU II can cause psychological harm. See Miller v. Stewart, 231

25   F.3d 1248, 1252 (9th Cir. 2000) (in a death row case, experts stated that conditions such as

26

27          [4] At the outset, the Court notes that Plaintiff's reliance on the decision in Koch v.
28   Lewis, 216 F.Supp. 2d 994 (D. Ariz. 2001) is misplaced because the decision was vacated.

1    SMU inmates can cause psychological decompensation to the point of incompetency); <u>Comer</u>

2    <u>v. Stewart</u>, 215 F.3d 910, 916 (9th Cir. 2000) (recognizing harsh conditions of Arizona's

3    death row can adversely affect mental health).   Other courts, however, have found that,

4    standing alone, the isolation inherent in segregation does not violate the Eighth Amendment.

5    <u>In re Long Term Admin. Segregation of Inmates Designated as Five Percenters</u>, 174 F.3d

6    464, 472 (4th Cir. 1999) ("the isolation inherent in administrative segregation or maximum

7    custody is not itself constitutionally objectionable"); <u>Jackson v. Meachum</u>, 699 F.2d 578,

8    581-83 (1st Cir. 1983) (no Eighth Amendment violation by confining inmate in indefinite

9    segregation that was otherwise satisfactory except for the virtually no communication or

10   association with other inmates, even when conditions caused depression).   While it is clear

11   that something more than isolation is required to violate the Eighth Amendment, it is not

12   exactly clear what the standard is.   Regardless, the Court need not reach that question

13   because the evidence does not show that Plaintiff is incarcerated in isolation.

14        Defendants submit evidence that SMU II inmates have a variety of opportunities for

15   social contact.   They may (1) make one five-minute phone call per week, (2) send and

16   receive letters, (3) communicate with other inmates in the pod from cell to cell,

17   (4) communicate with staff and counselors, and (5) have non-contact visitation weekly for

18   two hours and up to four visitors (McWilliams Decl. ¶¶ 14-15, 20, 22, 23, Ex. 5, Doc. # 92).

19   They also have access to a library for reading and legal materials and may order materials

20   by mail, and they may have a television and walkman radio in their cells (McWilliams Decl.

21   ¶¶ 17-18).

22        At his deposition in March 2007, Plaintiff admitted that he availed himself of these

23   opportunities.   He stated that he corresponded with his family members and he received

24   regular visits from family members.   (Doc. # 92, Ex. 7 at 46-47).   Plaintiff also has a

25   television and radio in his cell (<u>Id.</u> at 17-18).   The evidence does not show that Plaintiff is

26   isolated to a degree that would violate the Eighth Amendment.[5]   Defendants are entitled to

27

28        [5] Moreover, as noted previously, Plaintiff has the opportunity to be transferred out of
     SMU II through the prison's step-down program.

1   summary judgment on this claim.

2        **B.    Recreation, Sunlight, and Fresh Air.**

3        Defendants contended that effective November 29, 2005, the ADC increased the hours

4   in the exercise yard from 3 to 6 per week (McWilliams Decl. ¶ 24, Doc. # 92).  Defendants

5   contend that 6 hours is constitutionally sufficient.  They also assert that the yard is exposed

6   to fresh air and sunlight, and the inmate can see the sky through the steel mesh top (Id. ¶¶ 24-

7   25).  Plaintiff responds that he is being completely denied outdoor recreation and the fact that

8   he now receives six hours per week of recreation does not change the fact that it is not

9   outdoors, but merely a "backdoor cell" with a skylight (Doc. # 114 at 14).  Defendants reply

10  that the cell for recreation is an over-sized cell, with the roof open to the elements, which is

11  located contiguous to his pod (Doc. # 110 at 4-5).  Defendants contend that while outdoor

12  recreation conditions are restrictive, they do not amount to an Eighth Amendment violation.

13  They further contend that Plaintiff can work his major muscle groups by running in place,

14  walking, playing handball, and doing callisthenics (Doc. # 91 at 10).

15       The deprivation of outdoor exercise for inmates who are under long-term segregation

16  violates the Eighth Amendment.  Keenan v. Hall, 83 F.3d 1083, 1089 (9th Cir. 1996).  Five

17  hours of exercise per week has been found to be constitutionally sufficient.  See Baptisto v

18  Ryan, 2006 WL 798879, at *33 (D. Ariz. March 28, 2006) (collecting decisions of the

19  Fourth, Fifth, Seventh, Eighth, Ninth, and Tenth Circuits).  Plaintiff admits that he now has

20  the opportunity for exercise six hours per week.

21       Plaintiff states that the exercise yard does not equate to outdoor recreation, and further

22  that he has been denied access to exercise equipment for four years.  The recreation yard has

23  cement walls with a steel mesh top that allows fresh air and sunlight into the yard

24  (McWilliams Decl. ¶ 25).  It is thus undisputed that in the recreation yard, Plaintiff has light,

25  except on days that are not sunny.  Infrequent deprivation of sunlight, direct or indirect, does

26  not constitute a denial of the "minimal civilized measure of life's necessities."  Rhodes v.

27  Chapman, 542 U.S. 337, 347 (1981).  To determine whether an Eighth Amendment violation

28  has occurred, a Court should consider the circumstances, nature and duration of a deprivation

1   of these necessities. <u>Johnson v. Lewis</u>, 217 F.3d 726, 731 (9th Cir. 2000). "The more basic

2   the need, the shorter the time it can be withheld." <u>Hoptowit v. Ray</u>, 682 F.2d 1287, 1259 (9th

3   Cir. 1982).

4   　　　To demonstrate deliberate indifference, a prisoner must show that the official knew

5   of and disregarded an excessive risk to inmate safety; the official must both be aware of facts

6   from which the inference could be drawn that a substantial risk of serious harm exists, and

7   the official must also draw the inference. <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994).

8   Here there is no evidence to show that these Defendants acted with deliberate indifference,

9   especially in light of Plaintiff's failure to introduce evidence of a physical injury resulting

10  from the restrictions on his recreation. Defendants will be granted summary judgment on this

11  claim.

12  　　　**C.    Lighting.**

13  　　　Defendants acknowledge that one light in each cell in SMU II remains illuminated

14  twenty-four hours per day. Specifically, Defendants contend that the one security light

15  illuminated at night (between the hours of 10 p.m. and 4 a.m.)[6] is one seven-watt florescent

16  bulb. Defendants contend that the brightness of the security light is equivalent to a child's

17  nightlight. The remaining three forty-watt light bulbs are on from 4 a.m. and 10 p.m.

18  　　　Defendants posit that the security lights are necessary to serve the penological purpose

19  of enabling officers to perform health and safety checks each hour on the inmates. The

20  purpose of the safety checks are to ensure all inmates are in their cells and are alive.

21  　　　Plaintiff responds that the constant illumination has an impact on his physical,

22  psychological, and emotional state (Doc. # 114 at 28). Defendants reply that Plaintiff has

23  failed to articulate any specific instances of mental or physical harm resulting from his cell's

24  illumination.

25  　　　The Eighth Amendment requires that inmates be given appropriate lighting. <u>Keenan</u>

26  <u>v. Hall</u>, 83 F.3d 1083,1090 (9th Cir. 1996). The Court finds that Defendants have

27

28

　　　　[6] 12 a.m. and 4 a.m. on weekends.

1   demonstrated that the security light illuminated from 10 p.m. to 4 a.m. does not contravene

2   Plaintiff's Eighth Amendment rights.  Gonzalez v. Stewart, 2006 WL 2460634 at *2 (D.

3   Ariz., Aug. 22, 2006).  This is especially true because of Plaintiff's failure to specifically

4   articulate or demonstrate any mental or physical injury as a result of his cell's illumination.

5   In light of this evidence, there is nothing to show that Defendants acted with deliberate

6   indifference in dimming the lights at night for the purposes of inmate health and security.

7   As a result, Defendants will be granted summary judgment on this claim.

8           **D.     Food.**

9           The Eighth Amendment requires that inmates be provided with food that is adequate

10  to maintain health.  Keenan, 83 F.3d at 1091; LeMaire v. Maas, 12 F.3d 1444, 1445-46 (9th

11  Cir. 1993).  Plaintiff alleged in his Complaint that he was given limited amounts of food as

12  punishment.  Defendants assert that SMU II inmates receive a "diet consistent with a less-

13  active lifestyle" (McWilliams Decl. ¶ 27).  Defendants further aver that a nutritionist

14  determines the adequate amount of calories for inmates with low levels of activity.  Inmates

15  are fed three times daily during the weekend and twice daily on the weekends (Id.).

16          Plaintiff has not provided any evidence to demonstrate that he is malnourished or

17  significantly underweight.  There is no evidence to show that any of the named Defendants

18  were aware that Plaintiff did not receive the same quantities of food that other inmates in

19  SMU II were receiving.  Without such evidence, deliberate indifference cannot be shown.

20  Defendants are entitled to summary judgment on this claim as well.

21  **VI.     Count III.**

22          Plaintiff alleged that his placement in SMU II is retaliatory for his refusal to

23  incriminate himself and inform on others (Doc. # 1 at 6).  A viable claim of First Amendment

24  retaliation contains five basic elements: (1) an assertion that a state actor took some adverse

25  action against an inmate (2) because of (3) that prisoner's protected conduct and that such

26  action (4) chilled the inmate's exercise of his First Amendment rights (or that the inmate

27  suffered more than minimal harm) and (5) was not narrowly tailored to advance a legitimate

28  correctional goal.  Rhodes v. Robinson, 408 F.3d 559, 567-58 (9th Cir. 2005); Hines v.

- 14 -

1   <u>Gomez</u>, 108 F.3d 265, 267 (9th Cir. 1997).  These types of claims must be evaluated in light

2   of the deference and flexibility that must be accorded to prison officials.  <u>Pratt v. Rowland</u>,

3   65 F.3d 802, 807 (9th Cir. 1995).

4        Defendants correctly contend that there is no evidence that Plaintiff's refusal to

5   debrief interferes with his Fifth Amendment right not to incriminate himself.  The Fifth

6   Amendment protects against disclosures that a witness reasonably believes could be used in

7   a criminal prosecution or leads to other evidence that might be so used.  <u>Hiibel v. Sixth</u>

8   <u>Judicial Dist. Court of Nevada</u>, 542 U.S. 177, 190 (2004); <u>United States v. Bodwell</u>, 66 F.3d

9   1000, 10001 (9th Cir. 1995).  Defendants assert that under prison policy, the information

10  obtained in a debriefing is not for the purpose of future criminal proceedings, but is to ensure

11  that the inmate has withdrawn from the STG, to provide information about the STG so it can

12  be managed, and to determine if the inmate requires protection (Dunn Decl. ¶ 14 & Attach.

13  A, Dep't Order 806.06 (1.1)).  There is no evidence to show that the information gained in

14  a debriefing has ever been used in a criminal proceeding by the State.  <u>See</u> <u>Baxter v.</u>

15  <u>Palmigiano</u>, 425 U.S. 308, 317 (1976) (State did not seek make evidentiary use of silence at

16  a disciplinary hearing in any criminal proceeding).  Thus, there is no evidence to show that

17  it would reasonable to believe that any disclosures Plaintiff made regarding gang

18  involvement would be used against him in a criminal prosecution.  Plaintiff's constitutional

19  rights were not implicated by the debriefing requirement.

20       Moreover, Defendants correctly contend that the evidence shows that Plaintiff's

21  placement in SMU II is not retaliatory, but is for a legitimate correctional goal.  It is not

22  disputed that Plaintiff is viewed by prison officials as an ongoing security threat because of

23  his validation as a gang member.  Defendants are entitled to summary judgment on this

24  retaliation claim.

25  **VII.   Count IV.**

26       Plaintiff has alleged that his placement in SMU II has substantially burdened his right

27  to practice his Native American religion (Doc. # 1 at 7).  Specifically, Plaintiff claims that

28  he is not able to engage in pipe ceremonies and sweat lodges, possess red and blue

1   headbands, wear his religious medicine bag outside his cell, obtain certain herbs, or work

2   with a spiritual advisor because Defendants will not hire one (Id.).

3          Under RLUIPA, a government may not impose a substantial burden on the religious

4   exercise of a confined person unless the government establishes that the burden furthers a

5   "compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C.

6   § 2000cc-1(a)(1)-(2).  This "compelling government interest" and "least restrictive means"

7   test replaced Turner's "legitimate penological interest" test.  Warsoldier, 418 F.3d at 994

8   (citing 42 U.S.C. § 2000cc-1(a)).  Under its own terms, RLUIPA must be "construed broadly

9   in favor of protecting an inmate's right to exercise his religious beliefs."  Id. at 995 (citing

10  42 U.S.C. § 2000cc-3(g)).  The Supreme Court has upheld RLUIPA against an Establishment

11  Clause challenge.  Cutter v. Wilkinson, 544 U.S. 709 (2005).

12         The inmate bears the burden of establishing prima facie that RLUIPA has been

13  violated and that his religious exercise has been substantially burdened.  Warsoldier, 418

14  F.3d at 994 (citing 42 U.S.C. § 2000cc-2(b)).  The government then bears the burden of

15  proving that the substantial burden on the inmate's religious practice both furthers a

16  compelling governmental interest and is the least restrictive means of doing so.  Id. at 995

17  (citing 42 U.S.C. §§ 2000cc-1(a), 2000cc-2(b)).

18         An inmate-plaintiff bears the initial burden of demonstrating that his religious exercise

19  rights have been substantially burdened.  Warsoldier, 418 F.3d at 994.  "[A] 'substantial

20  burden' on 'religious exercise' must impose a significantly great restriction or onus upon

21  such exercise."  Id. at 995 (quotations omitted).  An inmate's religious exercise is

22  substantially burdened "'where the state . . . denies [an important benefit] because of conduct

23  mandated by religious belief, thereby putting substantial pressure on an adherent to modify

24  his behavior and to violate his belief.'"  Id.  Even indirect compulsion can substantially

25  burden religious exercise.  Id.

26         A.      Sweatlodge Ceremonies

27         Plaintiff's main complaint is that he is prohibited from participating in Native

28  American sweatlodges (Doc. # 1 at 6; Doc. # 114 at 63).  Defendants acknowledge that

1  sweatlodges are not permitted in SMU II because they require that the participant be outside

2  the view of security when they enter the sweatlodge and inmates housed at SMU II have the

3  highest institutional scores, requiring that they be in view of security at all times (Doc. # 92,

4  Ex. 9 ¶¶ 22-23).  Defendants do not dispute that the SMU II prohibition on sweatlodges

5  constitutes a substantial burden on Plaintiff's religious exercise (Doc. # 91 at 14).

6  Consequently, the Court must determine whether the prohibition advances a compelling

7  governmental interest and is the least restrictive means available.

8  **1.    Compelling Government Interest and Least Restrictive Means.**

9  A defendant has the burden of showing that a substantial burden on an inmate's

10 religious practice furthers a compelling government interest and is the least restrictive means

11 of doing so.  Warsoldier, 418 F.3d at 995.  Further, "'prison officials *must* set forth detailed

12 evidence, tailored to the situation, . . . that identifies the failings in the alternatives advanced

13 by the prisoner.'"  Id. at 1000 (citations omitted) (emphasis in original).

14 Defendants argue that ADC's prohibition on sweatlodges in SMU II is the least

15 restrictive policy to maintain the security of the prison.  Prison security and safety are

16 compelling governmental interests.  Warsoldier, 418 F.3d at 998.  According to the affidavit

17 of Michael Linderman, Administrator of Pastoral Activities, ADC has limited resources and

18 staff and to enhance both the safety and security of its maximum security facilities, it restricts

19 the ability of SMU II inmates to gather in groups (Doc. # 92, Ex. 9 at ¶ 25).  In general

20 population, where sweatlodges are permitted, inmates disappear from the view of security

21 when they enter the sweatlodge (Id. ¶ 23).  Because inmates in SMU II are classified as the

22 most dangerous and require the most security, ADC does not allow inmates to disappear from

23 view of security or congregate in groups (Id. ¶ 22).  This is sufficient to establish the

24 existence of a compelling governmental interest in maintaining safety of maximum security

25 facilities.

26 ADC's policy also appears to be the least restrictive means available.  Because the

27 inmates in SMU II represent the most dangerous and violent inmates in ADC custody, it is

28 imperative to restrict their activities and monitor them closely (Doc. # 92, Ex. 5 at ¶ 11).

1    Plaintiff has suggested no alternative that is less restrictive but still accommodates the ADC's

2    compelling interests in security and safety.

3          Moreover, Plaintiff is permitted to practice his religion by engaging in other Native

4    American ceremonies during recreation time, receiving visits from a religious leader, and

5    practicing his religion in his cell.  Defendants are entitled to summary judgment on this issue.

6          **B.     Pipe Ceremonies.**

7          Plaintiff contends that he is prohibited from engaging in a pipe ceremony with a

8    spiritual advisor, not that he is prohibited from engaging in a pipe ceremony at all (Doc. #

9    114 at 38).  Indeed, in his deposition, Plaintiff acknowledged that he is permitted to perform

10   his ceremonies while outside at recreation (Doc. # 92, Ex. 7 at 76).  And Plaintiff has not

11   countered Defendants' evidence that he is able to perform the ceremonies that produce smoke

12   outside (Doc. # 92, Ex. 9 at ¶ 18).  Nor has Plaintiff submitted any evidence that he cannot

13   perform a pipe ceremony by himself.  Plaintiff has not established that his religion has been

14   substantially burdened by the requirement that he perform his pipe ceremonies outside during

15   recreation.

16         **C.     Red and Blue Headbands.**

17         Plaintiff acknowledged during his deposition that he possesses headbands in the four

18   colors central to his faith (Doc. # 92, Ex. 7 at 80-81).  Plaintiff has not articulated how his

19   religious exercise rights have been substantially burdened by not being permitted to possess

20   a blue headband.

21         **D.     Medicine Bag.**

22         Similarly, Plaintiff is permitted to wear his medicine bag in his cell and at recreation

23   (Doc. # 92, Ex. 9 at ¶ 11).  If Plaintiff wishes to have a medicine bag in both places, he must

24   possess two of them because inmates are not permitted to wear medicine bags in transit (Id.

25   at ¶ 12).  Plaintiff has not articulated how this prohibition has substantially burdened his

26   religious exercise.

27         **E.     Herbs.**

28         Plaintiff acknowledges that he is permitted to purchase his sacred herbs from an ADC

1    approved vendor (Doc. # 114 at 43).  Plaintiff's complaint is that he would like to purchase

2    the herbs from another source or have them provided by family members because the ADC's

3    vendor takes too long (Id.).  Plaintiff is not entitled to purchase his supplies from any source

4    he chooses – and Plaintiff has not argued that he is unable to get the supplies that he needs

5    from the ADC's vendor.  The fact that Plaintiff is able to obtain the supplies he needs

6    precludes a finding that his religious exercise has been substantially burdened.

7    **F.   Spiritual Advisor.**

8    Plaintiff requests that the ADC employ a Native American spiritual advisor (Doc. #

9    114 at 39), but Plaintiff acknowledged during his deposition that he conducts his religious

10   ceremonies during his recreation time without a spiritual advisor (Doc. # 92, Ex. 7 at 35).

11   Plaintiff has been informed that he must find a spiritual advisor to visit with him (Doc. # 92,

12   Ex. 9, Attach. B).  Plaintiff has not demonstrated how being responsible for locating a

13   spiritual advisor to visit with him has substantially burdened his religious exercise.

14   **VIII.   Conclusion.**

15   Defendants have demonstrated that no reasonable jury could find that they have

16   violated Plaintiff's constitutional rights.  As a result, Defendants are entitled to summary

17   judgment as to all claims in Plaintiff's Complaint.

18   **IT IS ORDERED:**

19   1.     Defendants' Motion for Summary Judgment (Doc. # 91) is **GRANTED.**

20   2.     Plaintiff's Motion for Summary Judgment (Doc. # 114) is **DENIED.**

21   3.     This action is dismissed with prejudice and the Clerk of Court must enter

22          judgment accordingly.

23   DATED this 22nd day of January, 2008.

24

25

26   _____
                        David G. Campbell
27                  United States District Judge

28