**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Edward Hernandez | No. CV 05-2853-PHX-DGC (JJM) |
| Plaintiff, | **ORDER** |
| vs. | |
| Dora Schriro, et al., | |
| Defendants. | |

Plaintiff Edward Hernandez brought this civil rights action under 42 U.S.C. § 1983 against former Arizona Department of Corrections (ADC) Director Dora Schriro, Special Management Unit (SMU) II Deputy Warden Carson McWilliams, and ADC Correctional Classification Specialist Dorinda Cordova (Doc. 1). Before the Court is Defendants' Second Motion for Summary Judgment. For reasons stated below, the Court will grant the motion and terminate this action.[1]

## I. Background

This action stems from Plaintiff's validation as a member of a Security Threat Group (STG) and his subsequent placement in SMU II, the ADC's "supermax" administrative segregation housing unit. In his Complaint, filed in September 2005, Plaintiff originally presented four claims for relief alleging deprivation of due process, cruel and unusual punishment, retaliation, and a substantial burden on his religious exercise. The parties filed

---

[1] Plaintiff's request for oral argument is denied because the parties have fully briefed the issues and oral argument will not aid the Court's decision. *See* Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

cross-motions for summary judgment; the Court granted Defendants' motion and denied Plaintiff's motion in January 2008 (Doc. 126). Plaintiff appealed part of the Court's decision[2] and, in November 2009, the Ninth Circuit reversed the Judgment and remanded the case for further proceedings. In its memorandum, the Ninth Circuit addressed only the first claim – that Plaintiff has been denied due process in his continued detention in administrative segregation, and that the ADC's debriefing and step-down procedures are not adequate alternatives to the periodic review process because they expose inmates to a substantial risk of serious harm. The Ninth Circuit found that because Plaintiff's lighting, recreation, and religious exercise claims could be rendered moot if Plaintiff's due process claim succeeds on remand, it was not necessary to address those claims. Thus, the only remaining claim at this juncture is Plaintiff's claim that his due process rights are violated by his continued detention in administrative segregation without adequate or available alternatives to periodic reviews.

Pursuant to the Ninth Circuit's memorandum, the Court reopened discovery for four months on this discrete issue, permitting the parties to propound interrogatories, requests for documents, and requests for admissions, and to take depositions (Doc. 155). The record reflects that the parties did, indeed, engage in various forms of discovery, including written requests for information and taking depositions (Docs. 165-66). Following discovery, Defendants filed a second summary judgment motion, which is fully briefed (Doc. 171). See Hoffman v. Tonnemacher, 593 F.3d 908, 910 (9th. Cir. 2010) (holding that district court has authority to accept successive motions for summary judgment).

---

[2] Plaintiff appealed the Court's decision that his continued detention in administrative segregation did not violate due process, that the 24-hour lighting and limited opportunities for recreation did not violate the Eighth Amendment, and that the prohibition on pipe ceremonies and sweat lodges did not violate the Religious Land Use and Institutionalized Persons Act of 2000. Plaintiff did not appeal the remainder of the Court's decision.

## II. Legal Standards

### A. Summary Judgment

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Under summary judgment practice, the movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, that it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material (a fact that might affect the outcome of the suit under the governing law) and that the dispute is genuine (the evidence is such that a reasonable jury could return a verdict for the nonmovant). Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 250 (1986); see Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968), but must "come forward with specific facts showing that there is a genuine issue for trial," Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation omitted).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The court must believe the nonmovant's evidence and draw all inferences in his favor. Id. at 255.

### B. Due Process

The Due Process Clause of the Fourteenth Amendment prohibits the states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. To determine whether a procedural due process violation has occurred, a court engages in a two-step analysis. First, a court looks to whether the person possesses a constitutionally cognizable liberty interest with which the state has interfered.

Sandin v. Conner, 515 U.S. 472, 484 (1995). Second, if the state has interfered with a liberty interest, a court looks to whether this interference was accompanied by sufficient procedural and evidentiary safeguards. See Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989); see also Zimmerlee v. Keeney, 831 F.2d 183, 186 (9th Cir. 1987).

It is well-settled that placement in maximum security segregation units implicates a liberty interest requiring due process protections. Wilkinson v. Austin, 545 U.S. 209 (2005). An inmate may be deprived of his liberty interest as long as he is accorded the proper procedural protections.

For the initial decision to place an inmate in maximum custody, the procedural requirements of due process generally are satisfied by notice of the factual basis for the placement and an opportunity to be heard. Id. at 224-226; Hewitt v. Helms, 459 U.S. 460, 476 (1983). Thereafter, an inmate is entitled to "some sort" of periodic review of his status. See Hewitt, 459 U.S. at 477 n. 9 ("[A]dministrative segregation may not be used as a pretext for indefinite confinement of an inmate. Prison officials must engage in some sort of periodic review of the confinement of such inmates"); Wilkinson, 545 U.S. at 217, 229 (upholding a procedure that provides for review at least annually of continued retention in a supermax facility). To determine whether the periodic review afforded Plaintiff conforms to due process requirements, this Court must consider "[1] the private interest that will be affected by the official action; [2] the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [3] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Id. at 225; see also Matthews v. Eldridge, 424 U.S. 319 (1976).

**III. Facts**

The relevant undisputed factual assertions are summarized as follows:

In 1991, the ADC established an STG policy in an effort to control prison gang activity in Arizona's prisons (Doc. 172, Defs.' Statement of Facts (DSOF) ¶ 1). The goal of the STG policy was to reduce gang membership and activities, thereby decreasing violence,

intimidation, and harassment of other inmates (id.). An STG is defined under ADC policy as:

> Any organization, club, association or group of individuals, either formal or informal (including traditional prison gangs), that may have a common name or identifying sign or symbol, and whose members engage in activities that include, but are not limited to; planning, organizing, threatening, financing, soliciting, committing or attempting to commit unlawful acts or acts that would violate the Department's written instructions, which detract from the safe and orderly operation of prisons.

(Id. ¶ 4.) Validated STG members are housed in SMU II, now known as the Browning Unit, a high security "supermax" administrative segregation facility (id. ¶ 12).

Inmates who are suspected STG members are validated by an objective process by which an inmate is determined to be, or to have been, a member of an STG (id. ¶ 27). Upon a validation finding by the STG Validation Committee, an inmate may appeal the validation decision, choose to renounce his STG membership through the debriefing process, or accept his validation and not renounce his STG membership (id. at 37). Every year an inmate who refuses to renounce and debrief receives an annual review by Classification staff (id. ¶ 40). The review consists of an inquiry as to whether (a) the inmate is still associated with an STG, or (b) whether the inmate has disassociated himself from the STG, renounced his gang affiliation, and is sincerely willing and able to debrief (id.). A validated inmate is considered an ongoing threat to prison security and therefore is segregated and assigned to be housed at the maximum-security Browning Unit until the inmate is released from prison, renounces his STG membership and satisfactorily debriefs, or successfully completes the step-down program (id. ¶ 42).

The renunciation and debriefing procedure is one process by which a validated STG member agrees to renounce STG affiliation, successfully completes a debriefing, and is considered to be a former STG member (id. ¶ 44). The objective of debriefing is to learn enough about the validated STG member and the STG to convince the ADC that the inmate has withdrawn from the STG; provide additional information regarding the STG's structure, activity, and membership that would adversely impact the STG and assist in management of the STG population; and provide sufficient information to determine if the inmate may

require protection from other STG members or suspects (id. ¶ 46). A validated STG member who renounces membership and satisfactorily debriefs will be immediately housed in Protective Segregation (PS) and not placed in general population. The inmate is then reviewed for permanent PS status, which is ordinarily granted, barring a finding of continued STG involvement or another compelling security reason (id. ¶ 49). Once permanent PS is granted, the debriefed inmate is designated Involuntary Protective Segregation (IPS) status, which provides protection from other inmates who would feign the need for PS to gain access to harm the inmate (id.). A validated STG member can request to renounce and debrief at any time (id. ¶ 53). There is no waiting period to request to debrief, unless the inmate previously requested to debrief and failed to do so satisfactorily. Under those circumstances, the inmate is not eligible to debrief again for a period of six months after the first unsuccessful debriefing attempt (id.).

The second alternative to indefinite placement in administrative segregation is the step-down procedure (SDP). The SDP began in March 2006 and was substantially revised in November 2009 (id. ¶¶ 56-57). The SDP's purpose is to provide validated STG inmates a way to exit administrative segregation – without renouncing and debriefing – by permitting an inmate the opportunity to remove himself from STG activity and demonstrate to the ADC that the inmate is not involved in STG activity (id.).

To have been eligible to participate in the 2006 SDP, an inmate must have completed a continuous 24-month period where the inmate did not participate in any documented gang activity or have any documented incidents of assaultive behavior, extortion, or threats toward staff or other inmates (id. ¶ 59). Once this requirement was met, an inmate was eligible to inform staff in writing of his desire to participate in the SDP (id.). The first group of inmates entered the SDP on May 21, 2006, and the second group entered the SDP on August 26, 2006 (id. ¶ 105). Both groups graduated on June 16, 2008 (id.).

In late 2006, there was a homicide in the Browning Unit, unrelated to the SDP, which caused all movement in the Browning Unit to stop (id. ¶¶ 110-112). Thereafter, the SDP was substantially revised effective November 5, 2009 (id. ¶ 74). Under the new SDP policy, for

an inmate to be eligible to enter the SDP, he must successfully complete a 24-month period where he: (1) has not participated in any documented gang activity; (2) has no documented incidents of (a) assaultive behavior, extortion, or threats toward staff or other inmates, or weapons violations, (b) violations of drug usage, drug and/or drug paraphernalia possession, or drug conspiracy; (c) any participation in STG activity, to include supporting, encouraging, and acknowledging gang activity; and (3) successfully completes a polygraph examination that is specific in nature concerning the inmate's intent of participating in the SDP (id. ¶ 78). There is no waiting period for an inmate's initial evaluation of eligibility (id. ¶ 80). The SDP is divided into three 180-day phases and provides inmates progressively more freedom in three increments (id. ¶ 87). When eligible inmates can enter the SDP is dependent upon the time it takes a group to complete a phase. The third group of inmates entered on April 12, 2010. As of December 14, 2010, there was a group of 10 inmates ready to enter the SDP and another six inmates on the waiting list for the fifth group (id. ¶ 107).

## III.  Analysis

### A.  Sufficiency of the Alternatives to Annual Review

#### 1.  The Debriefing Process

Plaintiff maintains that debriefing is not a viable option because an inmate who debriefs labels himself a prison snitch and places himself at great risk of serious harm from other inmates. The Ninth Circuit's memorandum decision in this case noted that such a risk of harm could implicate Eighth Amendment concerns, cited Farmer v. Brennan, 511 U.S. 825, 832 (1994), and remanded for further factual development. Given the Ninth Circuit's Eighth Amendment reference and citation to Farmer, the Court will consider whether Plaintiff has presented evidence to support a finding that risks presented by debriefing raise Eighth Amendment concerns.[3]

---

[3] The Court does not read the Ninth Circuit's Memorandum as recognizing an implied, independent Eighth Amendment claim for deliberate indifference to Plaintiff's safety. Rather, the Memorandum notes that debriefing may not be a meaningful alternative to periodic reviews if it entails significant risk of assault from other inmates. As a result, the Court does not address both prongs of the deliberate indifference analysis. But to the extent

- 7 -

The Eighth Amendment requires prison officials to protect prisoners from violence at the hands of other prisoners. Id. at 833. When prison officials transfer an inmate who alleges that his well-being will be in jeopardy, their action constitutes an Eighth Amendment violation only if it can be shown that prison "officials acted with 'deliberate indifference' to the threat of serious harm or injury by another prisoner." Berg v. Kincheloe, 794 F.2d 457, 459 (9th Cir. 1986) (citations omitted); see also Redman v. County of San Diego, 942 F.2d 1435, 1449 (9th Cir. 1991) (en banc). The decision to transfer must display "deliberate indifference" to the inmate's personal security. See Redman, 942 F.2d at 1449. To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Farmer, 511 U.S. at 837. Therefore, to establish a violation, a prisoner must first satisfy an objective requirement – he must show that he has been transferred into "conditions posing a substantial risk of serious harm." Id. at 834. Then, he must satisfy a subjective requirement – he must show that the defendant was aware of the risk and disregarded it. Farmer, 511 U.S. at 834, 837.

The Court concludes that Plaintiff has failed to present sufficient evidence for a reasonable jury to find that debriefing would create a substantial risk of serious harm. Defendants introduce evidence that inmates who debrief and who ultimately leave administrative segregation are placed in protective segregation (DSOF ¶ 55). Plaintiff agrees with this fact (Doc. 181, Pl.'s Statement of Facts (PSOF) ¶¶ 55, 136). Consequently, the Court focuses its inquiry on whether debriefed inmates in protective segregation face a substantial risk of serious harm, as opposed to inmates identified as snitches in the general

---

that the Ninth Circuit meant to recognize such a claim, it clearly fails on summary judgment because Plaintiff has provided no evidence to show that Defendants subjectively knew of and disregarded a serious risk of injury from debriefing. To the contrary, all of the evidence concerning Defendants' knowledge and intent comes from Defendants' own testimony and shows that they are not aware of a serious risk of injury from debriefing. Farmer, 511 U.S. at 844 (finding that a prison official who responds reasonably to a risk is not liable even if the harm ultimately is not averted).

- 8 -

1 population. For this reason, Defendants' concession that inmates identified as snitches
2 generally face a substantial risk of serious harm is inapposite to the specific question
3 presented in this case; Defendants do not concede that such a risk exists in protective
4 segregation.

5 Defendants introduce the affidavits of Alfred Ramos, the Browning Unit's Deputy
6 Warden, and Staci Fay, the Browning Unit's former Chief of Security, who testified that they
7 are not aware of any debriefed inmates who have been assaulted in protective segregation
8 because of their debriefed status (Doc. 172, Ex. C, Ramos Dep. 75:18-76:7; Ex. E, Fay Dep.
9 61:6-25). Plaintiff argues that "[p]lacement in protective custody does not reduce the
10 obviousness of the danger nor [is] it a reasonable step to ensure prisoner safety" (Doc. 180
11 at 16). To support this contention, Plaintiff makes four factual assertions.

12 First, Plaintiff asserts that "it is common knowledge" in the prison population that
13 debriefed inmates face threats of serious injuries at the hands of other inmates, even when
14 housed in protective segregation (PSOF ¶ 138). In support, Plaintiff cites his own
15 declaration, but that declaration provides no evidence to support the assertion and no
16 foundation for Plaintiff's claim of "common knowledge" (Doc. 177, ¶¶ 9-10). Nor does the
17 declaration identify any instance where a debriefed inmate was assaulted or threatened.

18 Second, Plaintiff asserts that ADC acknowledges that even in protective segregation
19 there are instances of violence against debriefed inmates (PSOF ¶ 139). In support of this
20 assertion, Plaintiff cites two pages from the deposition of Alfred Ramos. In those pages, Mr.
21 Ramos is asked whether he knows of any inmates who, after being debriefed and placed in
22 protective custody, were "involved in any sort of fights or targeted by other gang members"
23 (Doc. 178-1 at 116). Ramos responds "No" (Id.). He does acknowledge that debriefed
24 inmates have been in fights, but he cannot say they were targeted by gangs (Id. at 116-17).
25 He concludes: "actual gang targeted hits, I know of none" (Id. at 117).

26 Third, Plaintiff asserts that ADC is aware of "possible" STG activity in protective
27 segregation (PSOF ¶ 140). In support, Plaintiff cites lines 3 through 19 of page 74 from the
28 deposition of Jerry Lee Dunn (Id.). Those lines and that page say nothing, however, about

1  STG activity in protective segregation (Doc. 178-1 at 56).

Fourth, Plaintiff asserts that ADC is aware of STG infiltration into protective segregation units (PSOF ¶ 141). In support, Plaintiff cites to Exhibit 15 to the Pelligrini Declaration, which in turn contains a page from the ADC website concerning the Aryan Brotherhood prison gang (Doc. 178-1 at 156). The page contains a section labeled "Trends," which in turn contains the following sentence: "*Talk* of infiltrating defectors & PS housing to assault inmates" (Id.; emphasis added). At most, this exhibit supports an assertion that the Aryan Brotherhood talks of infiltrating protective segregation to assault inmates.

In summary, Plaintiff has presented no evidence from which a reasonable jury could conclude that debriefed inmates placed in protective segregation are at risk of attack as snitches. While theoretical risk is always possible, Farmer requires more – "conditions posing a substantial risk of serious harm." 511 U.S. at 834. Plaintiff has failed to present evidence of such conditions.

Plaintiff seeks to bolster his argument by asserting that ADC does not categorically track incidents of violence against debriefed inmates, implying that this failure supports an inference that Defendants are aware of risks to debriefed inmates and are deliberately indifferent to those risks (PSOF ¶ 143; Doc. 180 at 17). The fact that ADC does not track a specific kind of assault, however, does not support a jury finding that such assaults occur.

Plaintiff also complains that Defendants failed to turn over files of debriefed inmates who have been assaulted while in protective segregation. As a consequence, Plaintiff asserts that the Court cannot know whether attacks are prevalent within protective segregation (id.). But Plaintiff never sought Court intervention to obtain this evidence. The Court provided sufficient time to conduct discovery. If Plaintiff's counsel felt such files were important, a phone call to the Court or motion to compel could have produced the evidence. Having failed to secure the evidence, Plaintiff cannot cite the lack of evidence to support his claim.

Plaintiff's reliance on Reece v. Groose is misplaced. 60 F.3d 487, 491 (8th Cir. 1995). While it was undisputed that Reece was assaulted because he was labeled a snitch, the real crux of that case was evidence creating an issue of fact as to whether prison officials took

reasonable measures to protect him from harm. The Eighth Circuit's opinion establishes that the prison officials "exposed" Reece to a known violent prisoner while housed in administrative segregation. Id. This case is not comparable to Reece because there is no evidence of a systemic failure of prison officials to protect debriefed protective segregation inmates, and no specific evidence that such a failure would occur in Plaintiff's case.

In short, viewing the evidence in the light most favorable to Plaintiff, the Court sees only an unsupported assertion that risks to debriefed inmates are "common knowledge" and evidence that the Aryan Brotherhood "talks" of infiltrating protective segregation units. To defeat summary judgment, Plaintiff must present evidence sufficient for a reasonable jury to return a verdict in his favor. Anderson, 477 U.S. at 248. Plaintiff has not done so. Evidence of unsupported "common knowledge" and "talk" by the Aryan Brotherhood simply is not enough for reasonable jurors to find that debriefed inmates face a substantial risk of serious harm. For these reasons, Defendants are entitled to summary judgment.

### 2. The Step-Down Program

Defendants do not dispute that the SDP was unavailable between late 2006 until April 2010 or that Plaintiff's December 2010 request to enter the SDP has not been approved. Rather, Defendants maintain that a second alternative path to exit administrative segregation – besides debriefing – is not constitutionally required. The Court agrees. Plaintiff is not entitled to a second means to obtain his release from administrative segregation if annual review and debriefing are available and satisfy due process, which the Court considers below.

### B. Due Process

In addition to contending that the debriefing process is not a viable option for administrative segregation inmates because it violates their Eighth Amendment rights, Plaintiff also argues that the annual review combined with the ability to debrief does not satisfy due process because it does not pass the test articulated in Matthews v. Eldridge, 424 U.S. at 319.

1. **Annual Reviews Alone**

In its order granting Defendants' summary judgment, the Court found that Plaintiff's due process rights were not violated by annual reviews of his status (Doc. 126 at 6-9). The Ninth Circuit reversed this finding, stating that annual reviews are insufficient (Doc. 137 at 3) (citing <u>Toussaint v. McCarthy</u>, 801 F.2d 1080, 1101 (9th Cir. 1986). In their pending motion, Defendants contend that annual reviews *are* sufficient and attempt to distinguish <u>Toussaint</u> from this case (Doc. 171 at 16-17). Plaintiff responds that the Ninth Circuit's determination that annual reviews are insufficient constitutes law of the case and cannot be revisited (Doc. 180 at 9).

The Ninth Circuit's memorandum was clear that it was remanding this case for further factual development as to whether reasonable avenues other than annual reviews exist for leaving administrative segregation (Doc. 137 at 3). The Court will not revisit whether annual reviews alone are sufficient to justify continued detention in administrative segregation.

2. **<u>Matthews v. Eldridge</u> Test — Annual Review and Debriefing**

Defendants argue the annual review of Plaintiff's status, combined with the ability to debrief at any time, satisfies due process. As stated, <u>Matthews</u>' established a three-part test to determine whether Plaintiff's periodic review conforms to due process requirements. <u>Wilkinson</u>, 545 U.S. at 225; <u>see also</u> <u>Matthews</u>, 424 U.S. at 319.

Plaintiff does not dispute that the first and third prongs of the <u>Matthews</u> test are satisfied (Doc. 180 at 17). He contends, however, that the ADC's periodic review does not meet the second <u>Matthews</u> factor because the ADC's periodic review only ascertains whether an inmate has debriefed and, therefore, does not evaluate whether the inmate still poses a risk to the safety of the institution (<u>id.</u> at 18). For example, Plaintiff argues that a particular STG could be decertified and cease to exist or an inmate's circumstances could change such that he is no longer able to participate in STG activity (<u>id.</u>).

Defendants claim that there is no risk for error in the periodic review process because it is an entirely objective inquiry; that is, there is no chance that prison officials will mistakenly determine that an inmate has not debriefed when he has, in fact, debriefed

1  (Doc. 171 at 23-24). Further, Defendants maintain that requiring additional safeguards
2  would not lessen the extremely small possibility for error in this factual process (id.).

3  The Court finds that the ADC's periodic review, combined with the ability to debrief
4  at any time, satisfies the Matthews test. Plaintiff's argument to the contrary is unavailing for
5  the following reasons.

6  When considering the second Matthews prong, the Court finds that Plaintiff has not
7  demonstrated that the procedures provided have a significant risk of error and, thus, possibly
8  require added safeguards. The annual review determinating whether an inmate has debriefed
9  is an objective and factual one. But Plaintiff does not argue that there is a risk that an
10 erroneous result may be reached. Rather, Plaintiff aims to broaden the scope of the inquiry
11 to determine whether each individual inmate still poses a risk to institutional safety. This
12 argument is unavailing because Defendants are not required to make individualized
13 determinations in order to justify an inmate's detention in administrative segregation; the
14 initial validation – which Plaintiff has not contested – is sufficient ground for retention. See
15 Hewitt, 459 U.S. at 477, n. 9 (noting that the requisite periodic reviews "will not necessarily
16 require that prison officials permit submission of any additional evidence or statements" as
17 to the initial decision."); Madrid v. Gomez, 889 F. Supp. 1146, 1278 (N.D. Cal. 1995)
18 (approving California's periodic review and noting that the "lack of continuing evidence of
19 gang membership or activity is simply considered irrelevant since the justification for
20 administrative segregation is the fact of gang membership itself, not any particular behavior
21 or activity.").

22 Nor does Plaintiff contend that he has requested to debrief, that the Warrior Society
23 has been decertified, or that he is incapable of STG activity. As a result, even considering
24 the additional safeguards suggested by Plaintiff, there is no evidence of a risk of an erroneous
25 result in his own periodic review process. To the extent that Plaintiff is attempting to facially
26 challenge the ADC's review of administrative segregation inmates' confinement status, the
27 argument is flawed because he does not argue or demonstrate that "no set of circumstances"
28 exists that would render the review valid. U.S. v. Salerno, 481 U.S. 739, 745 (1987).

Further, Plaintiff fails to cite to a single case – and the Court's research reveals none – holding that debriefing as the sole method of leaving administrative segregation violates due process. Terflinger v. Rowland, 76 F.3d 388, at *2 (9th Cir. 1996); Madrid, 889 F. Supp. at 1278 (N.D. Cal. 1995). Contrary to Plaintiff's contention, Walker v. Schriro, 2006 WL 2772845, at *4 (D. Ariz. Sept. 23, 2006), is not distinguishable merely because it did not explicitly consider the plaintiff's implied Eighth Amendment argument, which the Court has already considered.

Defendants have an obligation to "ensure the safety of guards and prison personnel, the public, and the prisoners themselves," while operating with limited resources and addressing prison gangs, "who seek nothing less than to control prison life and extend their power outside prison walls." Id. "It is clear . . . that prisons have a legitimate penological interest in stopping prison gang activity." Bruce v. Ylst, 351 F.3d 1283, 1289 (9th Cir. 2003).

Balancing the factors – the private interest, the risk of an erroneous deprivation, and the government's interest – the Court finds that Plaintiff has failed to show that the process afforded to him is inadequate. And Defendants correctly note that even if the review occurred more frequently, even daily, the result would remain the same because debriefing is the mechanism to exit administrative segregation. Because debriefing is available at any time, the periodic review of Plaintiff's status satisfies the Matthews test and Defendants are entitled to summary judgment on Plaintiff's due process claim.

**IV.     Plaintiff's Remaining Claims**

In his response to Defendants' summary judgment motion, Plaintiff asserts that his lighting, recreation, and RLUIPA claims should proceed to trial because Defendants failed to move for summary judgment (Doc. 180 at 22 n. 9). But the Ninth Circuit did not reverse this Court's decision on those issues and, as Defendants correctly note, the Court indicated that the record was sufficient on those issues and would not reopen discovery (Doc. 160 at 6:5-11, Aug. 11, 2010 Status Hr'g Tr.). Consequently, the decision as to those issues stands.

### V. Conclusion

After providing the parties ample opportunity for discovery, the Court finds no genuine issue of material fact as to whether the ADC's debriefing procedure constitutes a violation of Plaintiff's Eighth Amendment rights. After so concluding, the Court further finds that annual reviews of Plaintiff's status, combined with the ability to debrief at any time, is sufficient to satisfy due process. Defendants are therefore entitled to summary judgment.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 171).

(2) Defendants' Motion for Summary Judgment (Doc. 171) is **granted**.

(3) Plaintiff's Complaint is dismissed, and the Clerk of Court must enter judgment accordingly.

DATED this 20th day of July, 2011.

/s/ David G. Campbell
_____
David G. Campbell
United States District Judge